MARY A. ROBINSON, Appellant,

*vs.*

FRANCIS ADAMS and another, Executors.

62 369
87 572

*Probate appeal—practice. Burden of proof. Will. Delusion, insanity, and undue influence. Spiritualism.*

The burden of proving the due execution of an instrument offered for probate as a will, and the competency of the alleged testator to make it, is on the proponent throughout; he is, therefore, entitled to open and close the case to the jury.

These matters are to be proved by a preponderance of testimony.

As the statute requires a testator to be of sound mind, the usual presumption of sanity does not exist in these cases, but this condition of mind must be proved by the proponent.

In this case the main issues were, whether or not the testatrix was of sound mind when she made her will, and whether or not she was unduly influenced in making it, either by living persons or by what she believed to be communications from the spirit of her deceased husband, whom she declared had thus either dictated the will, or expressed his approval of its provisions. This belief, and an idea entertained by her that the husband of her only child was possessed of a familiar demon that enabled him to control his wife's affections and alienate them from her mother, and other similar opinions, together with some acts consonant therewith, were relied upon as evidence of the testatrix's insanity, or that she was governed by some extraneous influence superior to her own will. Upon the issue as to mental capacity the jury were instructed that when a mind not imbecile acts healthily it may be called sound; but if a testator acts under, and is influenced in making his will by a delusion which is the result of a disordered mind amounting to insanity, this will avoid the will; that there are different degrees of insanity; that entire lunacy would incapacitate a person from making a will, without proof of any delusion operating upon the testator's mind in making it; but that, where it is not contended that general insanity existed, but merely an insane delusion upon a special subject, then it is for the jury to determine, as matter of fact, whether or not such monomania predominated in the testator's mind at the time the will was made, so as to influence him in making it, and to affect its provisions; if it did, then the instrument would be void; that, to have this effect, it must be an *insane* delusion, and not a mere mistake of fact, or being misled by false testimony; that a false assumption does not invalidate unless it amounts to an insane delusion, which was defined by reading this extract from Bouvier's Law Dictionary. "A delusion is a diseased state

Robinson *v.* Adams.

of the mind, in which persons believe things to exist which exist only, or to the degree they are conceived of only, in their own imaginations, with the persuasion so fixed and firm that neither evidence nor argument can convince them to the contrary," and adding that insane delusions as a fact may exist where the supposed fact is the coinage of the brain without evidence, a figment of the imagination. The judge then read a definition furnished by the appellant's counsel, as follows: "In a legal point of view, insanity is where a person believes something to exist which not only does not exist, but of which he has no evidence sufficient to satisfy any healthy mind, and he acts upon it, reasons upon it, and holds it as a reality," and added, "that may be an insane delusion; that is to say, where it is palpable that he believes it without any reason sufficient to satisfy any healthy mind, and he acts upon it when it cannot possibly be true, that is an insane delusion." The jury were told to apply this test to the evidence in the case, and say whether or not, as matter of fact, the testatrix was laboring under an insane delusion when she made this will, the judge holding that it was not competent for him to determine this question as matter of law: *held*, that the instructions, rulings and submission were correct, and that it was properly left to the jury to say whether or not the testatrix's belief in spiritual communications and phenomena amounted to an insane delusion, and influenced the terms of her will.

The court declines to determine, as matter of law, that such a belief, if proved to exist is, *ipso facto*, evidence of insanity, or of an insane delusion.

The appellant requested to have the jury instructed:

I.  That if the testatrix believed that the spirit of her deceased husband directed or dictated the will and codicil, and acted under that belief, they are void;

II.  That if she entertained a groundless and causeless suspicion of her son-in-law's character, and that he was exposed to the control of evil spirits, and made the will and codicil under that influence, they are void;

III.  That if she disliked her son-in-law, and believed he had a supernatural power over his wife, through the aid of evil spirits, and was influenced to make her will and codicil by this belief, then they are both void;

IV.  That the will must be wholly the offspring of her own mind, uninfluenced by any delusion.

Thinking the first requested instruction applicable to the issue of undue influence, the judge gave it; the second, third and fourth, he gave with the qualification in each; that if such matters amounted to an insane delusion, as before explained, and influenced her in making the will, it would be void; *held*, that there was no error in giving these instructions thus qualified.

Upon the issue of undue influence the jury were told that if such a dominion, or influence, was obtained by others over the testatrix as to prevent the exercise of her own will, wishes and intention, and make it the act of others and not her own, the will would be void; that a testator might receive advice, opinions and arguments from others, yet if, after all such advice, requests or persuasions, the testator is not controlled by them to the extent

Robinson *v.* Adams.

of surrendering his free agency, and yielding his own judgment or will, and so not making his own will, but adopting as his the will of another, then there is no such undue influence as is required to avoid a will; and that the same principle applied whether the advice, opinions, or influences came from living persons, or were supposed to be communicated from the spirit of a deceased person. To this last clause, making no distinction as to the source of the influence, the appellant excepted; *held,* that this exception could not be sustained.

Upon an issue as to the sanity or insanity of a testator, a subscribing witness to the will, who is not an expert, may give his opinion as to the testator's mental condition when the will was executed, without first stating the facts and premises from which he arrived at his conclusion; though either party can, if they please, examine such witness as to what transpired at the time he witnessed the instrument.

It is no sufficient ground of exception that witnesses are permitted to state negatively in the course of their testimony, that they did not observe any thing peculiar about the mental condition of the testator at a time other than that at which the will was executed.

At the trial of this cause the appellant was rightly refused permission to adduce secondary evidence of the contents of papers not shown to be lost, and which she had not seasonably notified the executors to produce, if in their custody.

The issue framed being as to the testatrix's general soundness of mind, the court properly refused to confine the appellees to the introduction of testimony (relating to this branch of the case) as to the acts, declarations, conversations and statements of the testatrix, upon the single subject of spiritualism only; especially after the appellant had put in evidence as to her conduct, speech and opinions upon other topics, as indicating insanity or delusion.

Greater latitude in the admission of testimony must be given where the issue is as to a mental condition than would be permitted in relation to a single fact. Declarations, acts, and statements of a testator, extending over a term of years, may properly be admitted to establish the *status* of his mind when he made his will; but the jury should be cautioned (as they were in this case) that these are not to be taken as evidence of the truth of the matters stated, but only as to the mental condition of the decedent.

The fact that one such declaration, admitted for the purpose above indicated, has a jurat attached to it does not change its character, nor require that it be excluded for that reason.

ON EXCEPTIONS AND MOTION FOR A NEW TRIAL on the ground that the verdict and special findings of the jury were against law and evidence.

This was an appeal from the decree of the probate court of this.

county at its November Term, 1867, approving, allowing and admitting to probate certain instruments purporting to be the last will and testament of the late Mary W. Green, and a codicil thereto.   Mrs. Green's residence at the time of her death was in Topsham, where she had formerly lived with her late husband, Gardner Green, who died in 1840.   His widow, the testatrix, survived him about twenty-seven years, dying August 25, 1857, aged sixty-eight.   Their only child, who survived the mother, was the appellant in this case, who married George O. Robinson in 1854, and immediately afterwards accompanied her husband to Bloomington, Illinois, where they have ever since resided.   Mrs. Green made no objection to her daughter marrying Mr. Robinson, but favored it, and went with them when they first moved to Illinois, where they arrived October 21, 1854, remaining there twenty months, (nearly) when she returned to Maine.   The appellant testified that she did not then receive from her mother all the money promised ($3000,) as a marriage portion, though Mr. Robinson was then poor, just starting in practice as a lawyer, and they needed it; but she claimed that this was not the cause of her mother's leaving them, but that she was made uneasy and discontented by letters from Maine.   The appellant was asked by her counsel from whom these letters came, and offered to show that they were from Mrs. Green's brother, Alfred J. Stone, and sister, Mrs. Eliza Dennett, but this was objected to and excluded.   In June, 1856, Mrs. Green came back to Maine, but before leaving Bloomington, she gave her daughter two thousand dollars, and upon her second (and only other) visit to Bloomington, in 1864, gave her the other thousand dollars required to make up the promised dowry, with interest at the Illinois rate of ten per cent. per annum for the ten years that her daughter had then been married.   Mr. Robinson testified that he discovered that Mrs. Green was discontented in the December or January after they first reached Bloomington, "when the first payment was to be made under an arrangement by which we were to purchase a house lot, and a portion of the money that she had promised her daughter was to go in, and I was

to furnish part, and she refused to do it;" that it was originally agreed that the lot and house to be built upon it, were to be in his wife's name, but that on the tenth of May, 1856, he took a deed to himself. Though Mrs. Robinson disclaimed any ill-feeling, originating in this subject, between herself and her mother, it was evident that Mrs. Green was not satisfied, and took additional offence at some other pecuniary transactions between herself and Mr. Robinson. During the eight years and more, from 1856 to 1864, that intervened between the two visits of Mrs. Green to Bloomington, Mrs. Robinson neither wrote to her mother, nor came to Maine to see her, though the latter wrote repeatedly both to Mr. and Mrs. Robinson largely upon the subject of spiritualism, in which Mrs. Green first became interested soon after coming home in the summer of 1856, many of her letters covering communications purporting to come from her deceased husband and children, and also sent the Banner of Light, which, as well as several of her letters, and a gold chain she sent her grandchild, was returned to Mrs. Green. In 1864 Mrs. Green again visited her daughter, arriving December 17, saying she proposed to spend the rest of her days there, but she in fact stayed till August 14, 1866, when she again returned to Maine, Mr. and Mrs. Robinson coming with her for a short visit.

Mrs. Green never saw her daughter after this summer of 1866; nor were harmonious relations and feelings ever restored. Complaint was made that Mrs. Green while in Bloomington, and by letters subsequently written to that place, had caused rumors to be there circulated prejudicial to Mr. Robinson, and very annoying to him and his wife, though imputing no criminal offence, but relating to his treatment of his wife and her mother, importuning the latter for her money, and desiring to get her property into his hands. An unsuccessful attempt was made by Mr. Robinson to obtain possession of these letters, and the nature of their contents was the occasion of some unpleasant letters from Mr. and Mrs. Robinson to her mother, and uncle, A. J. Stone, who was supposed to have the custody of them.

Mrs. Green, on each return to Maine from Illinois, spoke to her friends here of her disappointment, in discovering the character and temper of her son-in-law, not to be what she had supposed and wished it to be; and complained of his conduct and language toward his wife and herself, as brutal, profane and abusive, and as being such as to excite alarm for her own personal safety. After her first visit, to wit, on the twenty-fifth day of September, A. D., 1857, she made a detailed and circumstantial statement in writing of these grievances, which she subscribed and made oath to before her brother (A. J. Stone) in his capacity of justice of the peace. This statement was received in evidence to show the relations between the parties, against the appellant's objections, based partly on the fact of it having the jurat attached to it. Upon the eleventh day of August, 1867, Mrs. Green made a second, briefer statement, of similar purport, entitled "Statement and deposition taken *in perpetuam,*" &c., signed and sealed by her, and witnessed by Francis Adams, Esq., and Dr. Joseph McKeen. This statement was also admitted, for the same purpose, subject to exception, and also oral testimony of the testatrix's declarations of like character and purport.

In some of her conversations upon this subject, after she became interested in the subject of spiritualism, Mrs. Green expressed her firm conviction that her son-in-law was under the control of an evil spirit, through whose aid he was enabled to influence his wife and alienate her affections from her mother; and stated that upon one particular occasion, during her first visit to Bloomington, Mr. Robinson and his wife went out into the garden, where he took her first by one hand and then by the other, looking all the while steadfastly into her face, and when they returned to the house, Mary Ann (Mrs. Robinson) was a wholly changed person, and so continued ever after; adding that, at the time of the occurrence, she (Mrs. Green) could not account for it, but after she became acquainted with the nature of spiritual phenomena she could, and understood that he had obtained complete spiritual dominion over his wife's mind and heart, diverting her thoughts and affections

from her mother. She told Dr. James McKeen that even when Robinson was not bodily present, if Mary Ann was kindly disposed toward her, he would "learn the current that was going through her mind, and stop all that;" that he would be standing way off in the garden, or some vacant lot, and weave his web round Mary Ann's mind, &c., &c. She made many other similar declarations; implicitly believed that the communications made to her purporting to come from her deceased husband and children actually came from them, saying it was "like advice or letters from a friend in some foreign part;" that she had the power of healing, which she occasionally attempted to exercise by "passes," or gestures with the hands; and she kept large books of spiritual communications which she deemed of great value.

Such being the relations between the parties, and the peculiarities of Mrs. Green's opinions and conduct, on the fifteenth day of January, 1866, she made the will here offered for probate. After the introductory clause, and a provision for the payment of debts and necessary expenses, the will proceeds :

"SECONDLY. I give, devise and bequeath all the property and estate, real, personal or mixed, and wherever situated, of which I may die seized and possessed, to Francis Adams, of Topsham, aforesaid, in trust, to be appropriated to and for the uses, and in the manner following, to wit:

I. During the lifetime of my daughter, Mary Ann Robinson, wife of George O. Robinson, my will is that said trustee pay and allow the use, income and interest arising from my said property to my said daughter, Mary Ann Robinson, the same to be to her own exclusive use, benefit and behoof, and to be in no wise subject to the debts, contracts or liabilities of her said husband.

II. After the decease of my said daughter, Mary Ann Robinson, my will is that, if the said Mary Ann leave an only child, the said trustee shall pay and allow the use, income and interest, arising from my said property to said child, during the lifetime of said child; or if said Mary Ann leave more than one child, the said trustee shall pay and allow the use, income and interest, aris-

ing from my said property to said children, during their lifetime, and the lifetime of the survivor of them, said children (if there be more than one) to share equally in such income and interest.

But if such child or one or more of such children, be under the age of twenty-one years at the time of the said Mary Ann's decease, my will is that the said trustee shall, thereafterwards, during the minority of such child or children, appropriate so much only of the income of said property, as shall be sufficient for the thorough and suitable education of said child or children, to that purpose, and I give to my said trustee power, and direct him, if necessary, by reason of a deficiency of all other resources, to use and appropriate for the support and maintenance of said child or children during their minority, so much of my said property and the income thereof as may be requisite for that purpose, but said last named power is not to be exercised, if the father of said child or children be of sufficient pecuniary ability to support and maintain them himself.

III.   If my said daughter, Mary Ann Robinson, die, leaving no child living, and there shall be a grandchild or grandchildren living, (the issue of a deceased child or children of the said Mary Ann,) at the time of her decease ; or if the said Mary Ann at her decease leave a child or children, and at the decease of said child, or the survivor of said children, (if there be more than one) there be issue of said child or children living, under the age of twenty-one years, my will is that during the minority of such grand-child or the youngest of such grand-children of the said Mary Ann, said trust estate shall continue, and the said trustee shall appropriate to the suitable education, support and maintenance of such grand-child or grand-children of the said Mary Ann, during their minority, the income of my said property, or so much thereof as may be necessary for that purpose.

IV.   On the arrival of such grand-child, or the youngest of such grand-children, of the said Mary Ann at the age of twenty-one years, (there being no child of the said Mary Ann then living) my will is that said trust estate shall terminate, and the whole of my

property, real and personal, shall go to such grand-child, or be divided equally among such grand-children (as the case may be) the share of each to be to them, their heirs and assigns forever.

THIRDLY. Should my said daughter, Mary Ann, die leaving no children or grand-children, or leaving children and such children should die leaving no issue, or leaving issue, such issue should die before coming to the age of twenty-one years, then my will is, that upon the happening of either of said contingencies, the residue of my estate and property, real and personal, remaining at that time shall forthwith go to the children of my brother, Alfred J. Stone, and to the children of my sister, Eliza Dennett, to be equally divided between them, and to hold to them, their heirs and assigns forever."

The next and concluding clause related to the appointment of executors and trustees, and then followed the customary formal execution and attestation of the instrument.

By a codicil, executed on the fourteenth day of August, 1867, presented for probate with the will, Mrs. Green made this testamentary provision—the first clause merely adding another gentleman as trustee:

"SECONDLY. I direct my said trustees, instead of paying to my daughter the whole of the income arising from my estate and property, as in my said will directed, to pay to the said Mary Ann, during the lifetime of her said husband, the sum of five hundred dollars for each year, and the residue of said income to be invested by my said trustees in such manner as they may judge most beneficial to my estate, but if the said Mary Ann shall survive her said husband, then from and after his decease she is to have the whole of said income during her lifetime as in said will provided."

At the time this codicil was executed Mrs. Green's statement dated August 11, 1866, hereinbefore mentioned, was signed by her and attested by the witnesses, being apparently intended as an informal explanation of her motives in making the testamentary disposition which she did of her property.

To defeat this will and codicil as obtained by undue influence,

and upon the ground of the insanity of the testatrix, the contestant introduced the books of spiritual communications kept by Mrs. Green and evidence of her acts and declarations, of the character hereinbefore indicated. It was testified that she had repeatedly said that her will met the approval of her husband, as she learned through a medium, and that she once declared that his spirit directed the terms of that instrument; and the communications purporting to come from him, said that her will was right, &c., &c. To rebut the presumptions thence arising the proponents proved that before she took any interest in the subject of spiritualism, she frequently expressed her determination that Mr. Robinson should not have the handling of any of her property after her decease; giving as her reason his treatment of her, alienating her daughter from her, ill-treating his wife, &c., &c.,—substantially the same grounds as set forth in her subsequent written statements. Upon the ninth day of June, 1856, just before leaving Bloomington, on the occasion of her first visit there, Mrs. Green made a will giving only the income of the estate to her daughter; and on the ninth day of October of that same year, after coming to Maine and finding that our law required three witnesses, whereas that of Illinois required but two, which was all there were to the instrument made in Bloomington, she applied to Hon. Edward E. Bourne, the judge of probate of York county, a connection of hers by marriage, to draw another will, carefully tieing up the estate so that it should never reach Mr. Robinson, and making Mr. Henry Kingsbury and Judge Bourne executors, and the latter a trustee, to receive and pay the income only to Mrs. Robinson. Mr. Bourne, called as a witness by the appellees, said that three facts or statements were impressed upon his mind: *first*, "that she did not want Mr. Robinson to have any of her property; that was the principal object of the will;" *second*, "that there was nothing strange in the rest of the will;" *third*, "she wished Mr. Kingsbury to be an executor." Subsequently, she became apprehensive that there was one possible contingency in which the instrument might fail of its desired effect; she therefore requested a friend to pro-

Robinson *v.* Adams.

cure Hon. Wm. G. Barrows, now a justice of this court, "to draft a will which would be as strong as language could make it"; * * * * * * "particularly to impress upon his mind that under no possible circumstances could Mr. Robinson control a dollar of her property." Accordingly such a will was drawn by Mr. Barrows, who testified, without objection, that "Mrs. Green at that time appeared to be a woman of good health of body and mind as far as I could judge;" and afterwards replied-to a question which was admitted, subject to the defendant's objection, that he "observed nothing peculiar any more than in any other lady, neither then nor at any other time."

Francis Adams testified that he drew the will now offered for probate; that Mrs. Green had it prepared because she saw that the one written by Judge Barrows did not provide against the contingency of Mr. Robinson's inheriting the estate as heir of his child should they all survive Mrs. Green and he outlive his wife and daughter, the latter dying of age and unmarried; and added, against objection, that he saw nothing peculiar in her at the time of its making or execution. Mr. Adams was not a medical man nor an attesting witness. The three gentlemen who did witness it, as well as those witnessing the codicil, were permitted to give their opinion that Mrs. Green was perfectly sane at the time of the execution of those instruments, without stating the appearances observed by them as the grounds for forming that judgment; to which the contestant excepted.

When the cause came on for a hearing at *nisi prius* the justice presiding directed (substantially) these three issues to be made up, joined and put to the jury: *First,* Were these instruments duly executed? *Second,* Was Mrs. Green then of sound mind? *Third,* Was she unduly influenced in making them by other persons or other influences than her own mind? To the first two questions the jury returned an affirmative and to the last a negative answer.

The court held that the burden was upon the appellees to sustain the instruments offered by them, and that they were, therefore,

entitled to open and close the case, to which the appellant excepted, as well as to the refusal of the judge to confine the appellees' testimony of Mrs. Green's acts and declarations to the single subject of spiritualism.

The several propositions, maintained in argument by the counsel for the appellant were presented to the court as requests for instructions; how far they were given, withheld, or modified, sufficiently appears by the opinion. They were as follows, viz:

"I. If Mrs. Green believed that the spirit of her deceased husband directed or dictated the will and codicil, and acted under that belief, they are void.

II. That if she entertained a groundless and causeless suspicion of Mr. Robinson's character, and that he was exposed to the control of evil spirits, and made the will and codicil under this influence, they are void.

III. That if she disliked Mr. Robinson and believed he had a supernatural power over his wife, or power through the aid of evil spirits, and was influenced to make her will and codicil as she did by this belief, they are void.

IV. That the will and codicil must be wholly the offspring of her own mind, uninfluenced by any delusion.

V. That if the said Mary W. Green was unduly influenced by Alfred J. Stone, or any other person, in making the codicil, it is void; and the same is true also of the will."

The appellant also contended that if Mrs. Green was in any respect influenced in the making of her will and codicil by supposed communications from the spirit of her deceased husband, they were void; that if she acted upon them simply as advice from her husband, or from his spirit, and made them in accordance with that advice, they were void.

*A. P. Gould*, for the appellant.

The questions to be considered are:

1. Whether the rulings and decisions of the court during the trial were correct, and whether the proper questions and issues were presented to the jury by the presiding judge?

2. Whether the questions and issues submitted were decided properly by the jury?

3. Whether upon all the facts proved or admitted, and the application of sound legal principles thereto, this will and codicil ought to be admitted to probate?

I. This case is of novel impression in this country, and of sufficient importance to the public to demand careful attention and a somewhat protracted discussion. The first step was proof of execution. The subscribing witnesses were improperly allowed to give their impressions as to the testator's mental condition without stating the facts upon which those opinions were founded. The rule is very clearly laid down in *Cilley v. Cilley*, 34 Maine, 163. Judge Redfield in his work on Wills, part 1, page 145, cites this case. See also *Hathorn v. King*, 8 Mass., 371; *Dickinson v. Barber*, 9 Mass., 225; *Heald v. Thing*, 45 Maine, 392, 397. Judge Barrows and Mrs Stone were permitted to give their opinions on this subject though they were neither experts nor subscribing witnesses. And Mallett is allowed to state, from what he observed, his opinion as to sanity; what it then was, not what it is now. This was erroneous. *Runyon v. Price*, 15 Ohio St. R., 1.

Counsel then discussed the influence of A. J. Stone upon his sister, and the impropriety of preventing the appellant from showing that the letters causing the original trouble in this family were from him and Mrs. Dennett, and of the exclusion of the testimony as to the contents of these letters.

The larger part of the testimony as to the testatrix's declarations was inadmissible, the instances in which such evidence is properly receivable being exceptional and the general rule being against their admission. Redfield on Wills, part 1, 544, citing *Stevens v. Vancleve*, 4 Wash., C. C., 265. This testimony is limited according to the issue presented. If general insanity is alleged, the declarations of the testator, during the period proposed, may be heard, but if the charge is special or topical insanity, proof of declarations should be confined to the particular topic. If a delusion is charged, bearing directly upon the will, its

nature and contents, the declarations admitted should be such only as relate to that particular delusion. The facts connected with the making of the wills in 1858, &c., were too remote in time to affect the question of sanity when this will and codicil were made. Redfield on Wills, part 1, 555–6.

II. We respectfully submit that on account of the peculiar difficulties of the case, the charge and instructions to the jury were in several material matters, defective, erroneous, and came short of the full duty of the court.

Perhaps no case has been tried in this State, where the duty of the presiding judge was more difficult, and certainly none where the full, complete and exact performance of that duty was more necessary, to enable the jury to perform their duty. Indeed, we cannot refrain from the remark that it is one of those cases in which the court can derive little aid from the jury, and that notwithstanding the findings upon the feigned issue to the jury, the principal duty still devolves upon the court. About the essential facts, there is no dispute. It is not every thing which is to be left to a jury in such a trial as this ; nor in any trial.

There are some facts in nature which the court will assume the existence of, and will not leave to the jury. Among these facts are the well known laws of nature.

The court will not ask the jury whether there are such facts in nature as life and death; nor whether a dead man can speak, or can make a contract, or a will; nor whether he can dictate or advise a living person how to do either. Nor will the court of a christian country ask a jury, whether death is a dissolution of the body from the soul; nor whether the spirit of a man, which has returned to God who gave it, and whose body has long since returned to dust, can participate in human affairs, which are the subject of legal action.

Such a court will not ask a jury, whether the universal philosophy is true, which teaches us that there is a great gulf betwixt the dead and the living, "So that they which would pass from hence cannot; neither can they pass to us that would come from

Robinson *v.* Adams.

thence;" nor whether "the spirit of man goeth upward" and has no longer any habitation here, and can no longer have any participation in the affairs of the living; nor will such a court admit, that departed spirits can invest the bodies of the living, whether such spirits are as pure and holy as Milton's angels, or as hideous and fiendish as Dante's devils.

But this court, we confidently trust, will, on the other hand, acting in harmony with that other christian court speaking for the British nation but a few months ago, by its Vice Chancellor Gifford, judicially declare, that this system of spiritualism, as it was believed and acted upon by the testatrix, "is mischievous nonsense, well calculated on the one hand, to delude the vain, the weak, the foolish, and the superstitious; and on the other, to assist the projects of the needy, and of the adventurer; and that beyond all doubt, there is plain law enough, and plain sense enough to forbid and prevent the retention of any acquisitions obtained through its aid." *Lyon v. Home,* 6 Eq. Cases, L. R. 1868, 655, 682.

This is not only good logic and sound sense, but good orthodox christianity also; and we therefore respectfully submit, that it ought to be declared by this court to be good law.

No mind can be sound and free from undue influence which is moved, constrained or restrained, in business transactions by this diabolical system.

We respectfully submit that it was the duty of the court to instruct the jury what constituted a "sound mind" in the sense of the statute, and what was necessary to prove it. While it was the province of the jury to determine whether those facts existed which would show whether the mind was sound or unsound, or whether the testatrix was possessed of testamentary capacity, we insist that it was the duty of the court to determine what constituted testamentary capacity.

It is one thing to determine in what testamentary capacity consists, and another thing to decide whether those facts or elements exist in a particular mind, which prove the person to be in posses-

sion of it. The same is true, beyond all question, in respect to what constitutes "undue influence."

The questions submitted to the jury were, whether the testatrix was o " "sound mind," and whether she was "unduly infl ienced." In what respect did the jury need the aid and instruction of the court, more than in determining what undue influence was, or what constituted a sound mind?

We claim that the judge, on these subjects, in some respects came short of his duty, and in others gave erroneous instructions. In almost every case to be found in the books in which the matter of testamentary capacity and undue influence are considered, we find the court discussing and deciding the question, as to what they are, and in what they consist. This is abundant proof that it is the duty of the court to decide these questions. The citation of numerous authorities is not necessary. We will note a few. *Overton v. Overton,* 18 B. Munroe, (Ky.) 61; *Pool v. Pool,* 35 Ala., 12; *Cornelius v. Cornelius,* 7 Jones' Law, (N. C.) 593.

It was claimed by the appellant that the testatrix was laboring under certain delusions; and that she was influenced in the making of her will by these delusions; and that these delusions constituted such a partial insanity as rendered a will made under their influence void. And in respect to what constituted such a partial insanity, the appellant's counsel maintained this proposition: that "In a legal point of view, insanity is where a person believes something to exist, which not only does not exist, but of which he has no evidence sufficient to satisfy any healthy mind, and he acts upon it, reasons upon it, and holds it as a reality."

This proposition which was taken from a work of very high authority, was not given to the jury as it stands, but was accompanied by this qualification, which the judge says is, "an additional qualification of my own," to wit: "That may be an insane delusion, that is to say, where it is so palpable that he believes without reason, any reason sufficient to satisfy any healthy mind, and he acts upon it when it cannot possibly be true, that is an insane delusion." And subsequently, in the course of the charge,

as will presently be seen, the judge virtually instructed the jury that it was incumbent upon the appellant to disprove the system of spiritualism, as developed in this case and believed by the testatrix. All the way through the trial and charge, the judge seemed to make a distinction between such delusion as constitutes a diseased state of mind, according to the authorities produced and relied upon by the appellant, and an *insane* delusion; and maintained that it was incumbent upon us to show the existence of an insane delusion, or something beyond the delusion described in the books produced.

The judge qualified the definition of insanity cited by us from Bouvier's Law Dictionary, by adding, "but insane delusion as a fact may be where the supposed fact is the coinage of the brain without evidence, a figment of the imagination." Now we know that there are many delusions which are not the coinage of the brain of the testator, but which are created in the mind of the testator by other parties or outside influences. Such was the fact in this case. There may be insane delusions, which are purely the manufacture or coinage of the deluded brain; but there are surely other delusions which render the mind insane upon particular topics, which are produced by extraneous influences.

The essence of a delusion which constitutes a diseased state of the mind is, that persons believe things to exist which do not exist, and that they believe them with a persuasion so fixed and firm, that they act upon them as truths. It is entirely immaterial whether they are the fruit of the individual imagination, or whether the mind has been wrought upon by outside influences.

Many other authorities were produced to show what constituted partial insanity.

*Dew v. Clark*, 1 Addams, 279; 2 Addams, 102; 3 Addams, 79; 1 Beck's Med. Jur. (11th ed.) 864; Redfield on Wills, 71, 72, note 1; 76, 77; *Stanton v. Whetherwax*, 16 Barb., 259; *Commonwealth v. Rodgers*, 7 Metc., 500, 502; Elwell on Malpractice and Medical Evidence, pp. 386, 390; *Boyd v. Eby*, 8 Watts, 71; Redfield on Wills, (2 ed.) pp. 78, 79; *Leech v. Leech*, 2 Penn. Law Journal, 179; *Woodbury v. Obear*, 7 Gray, 467, 470.

We do not contend that a mere speculative belief in spiritualism if it is not acted upon, and has no influence over the testator, would render a person incompetent to make a will; but we do contend that if the will was made under such an influence, or such an influence had any effect upon the mind of the testator in making the will, it is invalid.

The first request was, that, "If Mrs. Green believed that the spirit of her deceased husband directed or dictated the will and codicil, and acted under that belief, they are void."

On this subject, in his general charge, the judge instructed the jury, in substance, that the burden of proof was upon the appellant to disprove the truth of spiritualism. The appellant claimed that it was a delusion; that it should be assumed by the court that her husband who had been dead twenty-six years could not direct or advise the testatrix how to make a will; and that if she believed and acted upon the conviction that he could, and was governed in making the will by the belief that her husband directed it, speaking to her from the land of spirits, it was such a delusion as constituted her insane upon this subject.

But the judge says: "Now as to this matter of spiritual belief, there has been a great deal of testimony upon that subject generally; there has been a great deal of speculation, and a vast deal of evidence upon the subject. Did she believe in this spiritual revelation? Can there be any doubt that she did? To what extent, how far do they show delusion under the rule which I have given; that is to say, if she believed that spirits did communicate with human beings, through mediums, was that fact an insane delusion alone? * * * * Before you can say a thing is a delusion, you must have evidence that it does not exist; that is, before you can be safe in saying it, you must know it is not true, or have overwhelming evidence, that it is not true. * * * Before anything in law is a delusion, the non-existence of it must first be established."

Can there be any doubt that a jury would understand from such instructions as these, that it was incumbent upon us to disprove

the truth of spiritualism, before it could be assumed to be a delusion? What other force could this instruction have, than that they must have evidence that it did not exist; that they must have *overwhelming* evidence that it is not true; that before the law would treat it as a delusion, the non-existence of it must first be *established?*

Instead of assuming as the Vice Chancellor did in *Lyon v. Home,* that spiritualism is "mischievous nonsense," the judge left it to the jury to determine its truth, with the burden upon us to show that it is not true.

By his instructions the judge puts the living and the dead upon precisely the same footing, in respect to their influence, or supposed influence, over the mind and conduct of a person about to make a will. He assumes that the supposed communications of the dead may properly and legitimately influence and aid a woman in forming her conclusions, in respect to the disposition she will make of her property, in precisely the same manner as a living husband might do, if he were standing by her, giving her his advice, and the fruits of his larger experience and better judgment.

There is no doubt that a married woman, about to make a will, may very properly consult her husband, and may be largely governed by his judgment, and influenced by his better experience, and even by his wishes, and still the will be valid, so long as her own will is active, and is simply acting in accord with her husband's, and is not absolutely subordinated to his will in such a manner as to destroy her free moral agency.

The charge of the judge lays down this principle,—that a widow may be acting, in making her will, under the full conviction and belief that she has received from the spirit of her deceased husband, his advice, his wishes, the expression of his better judgment, purified, and rendered infallible, by heavenly scenes and associations, communicated to her directly from the presence of Deity himself, with the sanction and approval of Deity, (for communications can hardly be supposed to be made, without His knowledge and approval by the holy spirits who surround Him) that she may make

the will in exact accordance with such supposed advice, wishes and judgment, and still the will be valid, however great the influence which such fancied communications may have over her in forming her conclusions and making the will, so long as the effect falls short of an absolute subordination of her will, but simply brings it to accord with the supposed wishes and advice of the departed spirit.

That is, if she adopts the advice of the supposed spiritual communication, and acts upon it, believing it to be genuine, the will is valid, provided the effect of the advice simply is, to persuade her to form just such conclusions, and make just such a will, as the spirit advised, so that it was in fact her own wish, will and judgment, at last.

Perhaps the most prominent infirmity in this instruction is the obvious fact, that the two kinds of influence cannot be compared. They bear no relation whatever to one another. The advice of a living person is a fact; the supposed advice of a departed spirit is a fiction, and a miserable delusion. The mind may entertain the advice of the living person and be powerfully influenced by it, and still be sane; but the mind cannot entertain the delusion, that it is in direct communication with the spirits of the dead, upon business affairs, and be wholly sane. The court should have treated this whole matter of spiritualism, as bearing upon the question of soundness of mind, and have charged the jury that it was a delusion, and to be treated as such by the jury, and not charged them that it was to be regarded as a legitimate influence, capable of being compared with other legitimate influences over the mind of the testatrix.

Another great infirmity in this treatment of spiritualism is, that it cannot be possible that the testatrix should believe that she had received from the departed spirit of her husband, in whom she had absolute and entire confidence, "requests, persuasions and arguments, however persistently or however strongly urged," without being controlled by them, to the extent of surrendering her free agency, and yielding her own will and judgment, or subordinating

it, to the dictation of the spirit. She believed the communications came from a pure, holy spirit, and from the presence of "the Holy of Holies." Her faith in these communications is abundantly demonstrated by the evidence, and is even conceded by the appellees. Its effects upon, and influence over, her mind were fearful. She believed that she had power, directly communicated from above, through the intervention of these spirits, to heal the sick and to cast out devils; and that this power was the same in kind, which was possessed and exercised by the Saviour of mankind. Was it reasonable and proper, and in accordance with the demands of the case, that the judge should instruct the jury that they might compare this delusion with the advice of living persons, and treat it as an influence over the mind, as they were instructed to treat the influence of the advice of a living person? To her it was as though one "had arisen from the dead," and stood before her with a divine commission, revealing to her the hidden things of the future life; communicating to her all knowledge, past and future; investing her with more than mortal power, and taking her before her time, into the society of, and daily communion with, "the spirits of just men made perfect." She not only believed these spirits to be good, true and holy, but that freed from the restraints of "local habitation," they had the free range of the universe; that heaven hid nothing from their view, "nor the deep tract of hell;" that they had the same power of communicating to her the designs, the purposes and the deeds of angels of darkness, as of the angels of light. She saw with the same clearness the good spirit, which was advising, directing and counseling her, and the evil spirits which had taken possession of her unfortunate son-in-law, and were, in his person, weaving that fatal web, with which they held captive the mind, the heart and the affections of her much loved daughter. To compare such fatal delusions as these, with any rational influence, we respectfully submit, was a mistake in the presiding judge, fatal to the purposes of the trial.

The second and third requests pertain to the same general proposition, and will be considered together.

They are as follows: "That if she entertained a groundless and causeless suspicion of Mr. Robinson's character, and that he was exposed to the control of evil spirits, and made the will and codicil under that influence, they are void." The judge did not give this request, but said in reply, "I say so, if that amounts to insane delusion, as I have explained in the charge." Then follows the third request, as follows: "*Third.* That if she disliked Mr. Robinson, and believed that he had a supernatural power over his wife—a power through the aid of evil spirits—and was influenced to make her will and codicil, as she did, by this belief, then they are void."

In reply to this request, the judge instructed the jury: "I say no, unless that was an insane delusion as I have explained it; unless it amounts to an insane delusion." That she did thus believe will not be disputed, for it is proved by repeated witnesses called by both sides. That she was influenced to make her will as she did by this belief, and by the groundless and causeless suspicion of the character of Mr. Robinson, cannot be reasonably doubted by any one who carefully examines the will, and the evidence of her views and feelings and delusions in respect to him. Did the court perform the full measure of its duty to the appellant, when called upon to instruct the jury, that if in making the will and codicil, which deprived her of her just rights, her mother was influenced to make it as she did, by a groundless and causeless suspicion of Mr. Robinson's character, and that he was exposed to the control of evil spirits, and that he had a supernatural power over his wife—a power through the aid of evil spirits—then they are void, by saying to the jury, "I say no, unless that was an insane delusion?" In his general charge he instructed the jury as follows:

"Now as to this matter of spiritual belief, we have had a great deal of testimony upon that subject generally; there has been a great deal of speculation, a vast deal of evidence upon the subject. Did she believe in this spiritual revelation? Can there be any doubt that she did? To what extent, how far do they show delusion under the rule which I have given; that is to say, if she

believed that spirits did communicate with human beings through mediums, was that fact an insane delusion alone? If so, gentlemen, undoubtedly there would be a very large number of people in the country incapable of making wills. A great many people believe it is a reality. Then comes up the difficulty of our being able to say that because we think a thing absurd, that therefore it is a delusion in their minds; that they believe a thing that does not exist, and therefore it is a delusion. Before you say a thing is a delusion, you must have evidence that it does not exist; that is, before you can be safe in saying it, you must know it is not true, or have such overwhelming evidence that it is not true, that no sane man can believe it true. Is this opinion one of that sort of things that people believe in so as to upset their reason and their ability to take care of their property, and to dispose of it? Before anything in law is a delusion, the non-existence of it must first be established." We say that it was the duty of the court to declare, that spiritualism, as applied to the making of the will in these requests, was an insane delusion, and that the will and codicil, if made, as assumed in the request, under the influence of this delusion, were void. And we contend, that it should not have been left to the jury to say whether a will could be sustained which the testatrix was influenced to make as she did, by the belief that Mr. Robinson was under the control of evil spirits, and himself was endowed with supernatural power, and that he exercised that power through the aid of evil spirits, over his wife. Under this delusion she excluded the husband of her only child forever from any participation in her estate, and excluded her daughter from it, (except less than one-half of the income) simply because her daughter was the wife of a man whom she believed to be an incarnate devil.

That partial insanity avoids a will affected by the particular monomania of the testator, see 1 Redfield on Wills, 82, § 13; *Seaman's Soc. v. Hopper*, 33 N. Y., 619; *Lucas v. Parsons*, 24 Georgia, 640; Greenwood's case, 13 Vesey, 88; Taylor's Medical Jur., 631, 673; Shelford on Lunacy, 41; *Coleman v. Robertson*, 17 Ala., 84; *Florey v. Florey*, 24 Ala., 241; Encyclopedia Brit-

tanica, vol. xiv., Mental Diseases, Monomania, 531; Ray's Medical Jur., 265, § 274, and p. 268, § 276; 2 Pothier on Obligations, App., 24.

The counsel then entered into a very elaborate and able examination and analysis of the testimony, to show the verdict erroneous as matter of fact.

He then claimed, as a legal proposition, that the peculiar provisions of the will were, of themselves, indications of a disordered intellect. *Peck v. Cary*, 27 N. Y., 9; *Fairchild v. Bascomb*, 35 Vermont, 398.

The jury should have been instructed, agreeably to our request, that the burden of proving the testator's sanity was upon the proponents of the will, "and if upon the whole evidence it is left uncertain, whether the testatrix was of sound mind or not, the will cannot be proved." This is the language of *Crowninshield v. Crowninshield*, 2 Gray, 524. It seems impossible to resist the conviction that the jury must have understood that the delusions proved in this case did not constitute unsoundness of mind; that spiritualism was not to be regarded as a delusion, in the absence of testimony produced in court, to show that it was not true; and that the belief in supernatural influences over the mind and conduct of Mr. Robinson, and in the exercise of diabolical power by him over his wife, did not constitute insane delusion, or unsoundness of mind. Fearing this, we asked for a distinct finding by the jury whether or not Mrs. Green was influenced by her peculiar opinions upon these subjects in making her will; accordingly we drew a question, asking whether or not Mrs. Green was influenced in making her will, by the belief that she was acting in accordance with the advice or direction of her spirit husband, but the court declined to submit it to the jury. Doubtless, it would have been answered in the affirmative; and the court would then have had to determine whether or not this was such a delusion or undue influence as to invalidate the will.

In the case of *Shaler v. Barnstead, et als.*, 99 Mass., 112, 131, the court says: "The findings of the jury in such cases, are

availed of to inform the court in matters of controverted facts, which may become material in settling the final decree. They may be disregarded, in whole or in part, if on the final hearing they are not deemed important or relevant; or such new issues may from time to time be framed and submitted as a just regard to the rights of all may seem to require."

Unless the court is satisfied upon the evidence that this will ought not to be admitted to probate, we ask that new issues may be framed, inquiring more definitely of the jury as to the effect of these delusions upon the testatrix's mind, in the matter of making this will, put in a more simple and direct form, giving less occasion for learned discussions before the jury upon questions of mental and moral science, which it is so difficult to bring within their comprehension, leaving the more abstruse and complicated questions for the determination of the court, upon the findings of the jury upon simple matters of fact.

But we ask the court now to decide whether they will give this system of spiritualism a standing in court. Shall it be treated as a legitimate influence in business transactions? Are we to treat it as a fact in legal investigations, as a due and proper influence over any mind, weak or strong, in the gravest business transactions of life? How is the court to take cognizance of it? By what rules weigh or measure it? What rules of logic will you apply to it? With what other phenomena, physical or mental, will you compare it? What bounds will you set to it? With what judgment will you judge it? From what source will you demand authority for your guidance in your judgments upon it?

It is impossible. True or false, as a speculative or religious theory, we cannot allow its influence or its aid, in making contracts or wills.

There is much practical sense in the remarks of the London Saturday Review for May 2, 1868, p. 582, upon the case of *Lyon v. Home*, then just argued before Gifford, V. C.: "It is not necessary to say whether the spirit revelations are, or are not true.

However true they may be, our question is, whether we are to allow them to be other than undue influences?

The spirits may be very virtuous, pious, pure, disinterested and righteous; might arrange mundane things better than we do; but their sort of purity and righteousness is quite incompatible with our poor, unspiritual society, such as it is. And, therefore, we cannot come to an understanding with the spirits. In other words, the Vice Chancellor will have to notify all and singular, spirits and souls of the righteous and unrighteous, all witches and wizards, ghosts and ghost-seers, goblins and mediums, spirit-drawings and airy harps, that deeds of gift, assignments and wills, dictated by the spirits to rich and silly widows, will be summarily set aside, as transactions which English law and equity decline to recognize."

*A. Libbey, W. Gilbert* and *Francis Adams,* for the appellees.

The opinion of the subscribing witnesses was properly admitted. *Ware v. Ware,* 8 Maine, 42; *Cilley v. Cilley,* 34 Maine, 162; *Poole v. Richardson,* 3 Mass., 330; *Buckminster v. Perry,* 4 Mass., 593; *Needham v. Ide,* 5 Pick., 510; *Commonwealth v. Wilson,* 1 Gray, 337.

The exceptions must be confined to the instructions given contrary to the appellant's requests and to those refused; exceptions to the charge *en masse* cannot be sustained. *Lincoln v. Claflin,* 7 Wallace, 132.

The qualification annexed to the second instruction was required by law. An erroneous belief in regard to the character of Mr. Robinson, not improperly imposed upon Mrs. Green by any one to induce her to make this will, and not amounting to insane delusion, will not invalidate the will. 1 Redfield on Wills, 89, § 23; *Woodbury v. Obear,* 7 Gray, 467; *Thompson v. Quimby,* 2 Bradf. Sur. R., 449; *Thompson v. Thompson,* 21 Barb., 107.

The instruction requested did not embrace the element of unsound mind, nor undue influence exerted upon Mrs. Green by any one, to induce her to make the will. It embraced only the element of unfounded and erroneous belief.

The fifth proposition is precisely correct as qualified and stated in the charge. 1 Redfield on Wills, 524, §§ 30, 36, 38, 43, 45, 46, and cases cited. *Small v. Small*, 4 Maine, 220; *Gardner v. Gardner*, 22 Wend., 526; *Eckert v. Floury*, 43 Penn. St. R., 46; *Dean v. Nagley*, 44 Penn. St. R., 312.

The instruction in regard to the influence on Mrs. Green, resulting from her belief in the spiritual communications from her deceased husband, placing it on the same ground as if the communication had been made by a living person, to induce her to make the will, was favorable to the appellant; more favorable, if these communications were not true, than the law will warrant. Because it is an influence arising from an erroneous belief not imposed upon the testator by any living person to procure the making of the will, is entirely free from fraud, and does not possess the elements which all the authorities, which we have been able to find, lay down as essential to undue influence sufficient to avoid a will. 1 Redfield on Wills, 89, § 23, and cases cited.

Especially is this favorable to appellant when we consider the fact that the only evidence that the approval of her husband's spirit was communicated to her at all, is the proof of the declarations of testatrix made after the will was executed; and the authorities agree that such evidence is not to be received as evidence of the fact, but only to show the condition of the mind. 1 Redfield on Wills, 546, § 39, p. 555, o. p. q. *Woodbury v. Obear*, 7 Gray, 467.

The jury have found that testatrix was of sound mind, and that she was not unduly influenced by other persons and other influences than her own mind.

These findings, based on correct rules of law, are conclusive.

KENT, J. This is an appeal from the decree of the probate court, allowing and probating the instruments purporting to be the last will and testament and codicil of Mary W. Green, widow of Gardner Green, late of Topsham, in this county, deceased.

The sole heir at law, the appellant, contests the probate of the

will and codicil. The will and codicil, instead of giving the estate directly to her, absolutely and in fee, devises all the property and estate, after payment of debts and expenses, to trustees, in trust for the uses specified. The substance of the provisions as to the trusts designated is—that the daughter, the appellant, shall have five hundred dollars *per annum*, out of the income of the estate, during the life of her husband, the residue of the income to be invested by the trustees. If the daughter shall survive her husband, then, after his decease, she is to have the whole of the income of the estate during her lifetime, to her own exclusive use and benefit. After her decease the whole income is to be paid to her surviving child or children, and to the survivor of them during life, or during minority what the trustees may deem necessary for their thorough and suitable education; and, if necessary, they are to appropriate a part of the property, beside the income, for their support and education, provided the father is not of sufficient pecuniary ability to support and maintain them himself. The will then proceeds to make provisions by which the trust is to be continued, for the benefit of grand-children of the daughter, if any, and it is not to be terminated until the arrival of the youngest grand-child at the age of twenty-one years, when the whole estate, real and personal, is to go to the grand-child or grand-children, absolutely free of the trust, to them and their heirs forever.

In case the testatrix's daughter dies leaving no lineal descendants surviving her, the property is to be divided among the children of the brother and sister of the testatrix, to whom it is also to go in case of the death of all the *cestuis que trust* before the youngest attains the age of twenty-one years.

In the trial of this case, certain questions were put in issue, under the direction of the court, arising under the pleas filed and joined. There were three separate pleas; in substance, these :—
I. Denial of the due execution of the will; II. That the testatrix was not of sound mind at the time of the supposed execution of the will; III. That she was unduly influenced in the making of the will by various persons "and that the instruments (will and

codicil) were not the fruit of her own mind and will, uncontrolled by other persons and influences." There was no brief statement specifying or limiting the points presented by the pleas.

The executors introduced evidence to prove the legal execution of the will, and the soundness of the mind of the testatrix. The only questions raised under this part of the case had relation to the admission of certain evidence, and the instructions given as to the burden of proof and as to preponderance of evidence. These will be considered hereafter.

The appellant then offered a large amount of testimony under the second and third pleas, and to rebut the evidence as to soundness of mind, and to establish the fact of undue influence. This testimony took a wide range, and had relation to the history of the domestic relations between the daughter (the appellant) and the mother (the testatrix) and the husband of the daughter, including acts, visits, declarations, letters, evincing more or less of affection for her daughter and of aversion and dislike to her son-in-law, and persistent determination in such dislike, and in a purpose to prevent the daughter's husband from receiving anything from her estate. The same kind of testimony was introduced to show undue influence on the part of living persons and from what she believed to be the spirit of her deceased husband, communicating with her through mediums. Under these pleas also there was a large amount of evidence, oral and written, to show that the testatrix was a firm believer in what are termed spiritual communications, between the living and the dead, generally believed by the class of people known as modern spiritualists.

The appellees (the executors) then introduced counter evidence on the same general topics, and such as they deemed pertinent to sustain their proposition of testamentary capacity and to refute the allegations of undue influence.

On this body of evidence it became the duty of the presiding judge to give instructions to the jury, and to some of these instructions, and to some denials of instructions requested, the appellant excepts.

We will first consider the exceptions to the charge.

The judge first considered the questions of soundness of mind, and subsequently as a distinct matter, the question of undue influence, placing them before the jury separately.

I. SANITY. The presiding judge stated to the jury that the statute makes soundness of mind a requisite qualification in a testator; hence, that it was incumbent on those who set up the will to establish this fact, and that burden does not shift; that the rule of preponderance of testimony in civil cases applies—not the rule of the criminal law. He said that "a person of sound mind" were the words of the statute; that a sound mind was a sane mind; that sanity meant health, and that, therefore, a sane mind was a healthy mind. When a mind, not imbecile, acts healthy it may be called sound. But if a testator acts under a delusion which is the result of a disordered mind, amounting to insanity, and this delusion influences the testator in making his will, or any part of it, it will be sufficient to avoid it, on the ground of want of a sound mind when he made it.

The judge,—after stating the fact that there were different degrees of insanity, and alluding to the cases of general insanity, in which all or most of the faculties and affections are deranged, so that this class are commonly said to be lunatics, entirely crazy, sometimes raving maniacs and sometimes quieter, yet with most of their powers of mind deranged, and the whole mind in a state of chaos and confusion,—said he did not deem it necessary to discuss that kind of insanity as it was not contended that this testatrix was in that condition of entire lunacy or madness. He would only say that if she was in that condition, then she was incapable of making a will, whether it could be established or not that any of such insane delusions operated upon her to make the will, or any part of it. But he did not understand that it was contended in this case that the testatrix was in that condition of entire lunacy when she made the will and codicil, but it is contended that her mind had become deranged from a healthy state and that she entertained insane delusions, within the rule before given. He then

told the jury that it was for them to decide whether she did or did not; and that if Mrs. Green, at the time of executing her will and codicil, or either of them, was laboring under a delusion or delusions amounting to insanity or monomania, which is insanity on a particular subject, or under insanity generally; and any of these insane delusions operated upon or influenced her in making the will as it was made, then she was not of the sound mind required by law.

The substance of this seems to be that the appellant contended that the evidence was sufficient to prove delusions, existing in her mind, such as would invalidate the will. The court ruled that the delusions must be such as amounted to insane delusions.

The propositions of the counsel, presented as requests for instructions, indicate clearly the specific points and grounds in relation to which it was claimed that these delusions existed, and to which the rulings were applied. The first requested instruction was this: that if Mrs. Green believed that the spirit of her deceased husband directed or dictated the will and codicil and acted under that belief, they are void.

The second was: That if she entertained a groundless and causeless suspicion of Mr. Robinson's character, and that he was exposed to the control of evil spirits, and made the will and codicil under that influence, they are void.

The third was: That if she disliked Mr. Robinson, and believed that he had a supernatural power over his wife—a power through the aid of evil spirits—and was influenced to make her will and codicil as she did by this belief, then they are void.

The fourth was: That the will and codicil must be wholly the offspring of her own mind uninfluenced by any delusion.

As to the first requested instruction, the judge said, as appears by the report: "I give you that. I have already given it to you in substance." The judge evidently understood the request as bearing on the other point, of undue influence, concerning which the fifth request was presented. The judge had charged fully that if she believed that the spirit of her deceased husband direc-

ted or dictated the will, it would be void on the ground of undue influence, as will more fully appear when we come to consider that point of undue influence. The counsel, in his argument on this hearing, regards this as in substance a request to instruct that if such belief had any influence, although short of direction and dictation, it would invalidate the will. Or perhaps, in short, that a belief in spiritual communication was in itself an insane delusion, if it had any influence on the mind of the testatrix in making her will. If the judge had so understood the request, he would, doubtless, in consonance with his whole charge, have given this as he gave the second, third and fourth requests (above recited) with the qualification in each, that if such matters amounted to insane delusion, as explained in the charge, and influenced her in making her will, the will would be void. The requests were, in effect, that the judge should rule as matter of law, that these specified matters, under each head, did establish such delusion as would render the will void. The judge did not thus take the question from the jury, but told them that it was for them to determine whether there was such a state of mind as came within the rules and definitions given to them. This was stated, as before recited, in the first part of his charge; and after calling the attention of the jury to the points made, and the facts proved, and the evidence bearing on each and all of them, he concluded his charge on this part of the case by saying: "The point is this: did these things, these beliefs, these matters, with other influences, no matter what, create in her mind insane delusions? Did she act on them in the making of her will, or any item of it? If so, then you will be justified in saying she was not of sound mind." We think it clear that the final determination as to the testamentary soundness was with the jury after the definitions and rulings of the court as to the legal questions had been given to them.

Was there any substantial or material error in these rulings and definitions?

The charge was long and is reported by the stenographer in full and doubtless correctly. But it necessarily presents many

remarks and illustrations and repetitions which render it somewhat difficult to reduce the whole to a few simple propositions. Indeed, it is very difficult to comprehend the exact import of the charge in all its bearings without a perusal of the whole as given; but to afford this would extend this opinion unreasonably; a brief statement of the points must, therefore, suffice.

After stating that if a testator acts under a delusion, the will which is the result of a disordered mind is invalid, (as before set forth) the judge called the attention of the jury to the point that the delusion must be the act of a disordered mind, and that the term delusion, as applicable to insanity, is not a mere mistake of a fact, or the being misled by false testimony or statements to believe that a fact exists where it does not exist. This is sometimes termed delusion in common conversation. So some men will believe on much less evidence than others that a fact exists, particularly in matters not tangible to the senses, but resting in mental or spiritual theories or beliefs. A false assumption does not invalidate, unless it is an insane delusion.

The principal objection now made to the charge, under the general objection to it as a whole, relates to the definition given of an insane delusion. The judge read from Bouvier's Law Dictionary this definition: "A delusion is a diseased state of the mind in which persons believe things to exist, which exist only, or to the degree they are conceived of only, in their own imaginations, with the persuasion so fixed and firm that neither evidence nor argument can convince them to the contrary."

The judge then added: "But insane delusion as a fact may be where the supposed fact is the coinage of the brain, without evidence, a figment of the imagination." To this addition the counsel excepts, assuming that this was a definition extending and including all cases of insane delusion. But it was simply a definition applicable to one class of delusions and not intended to exclude all other cases; and even this was not stated absolutely and was confined to delusion as of a fact. The judge then explained to the jury the difference between a delusion as to the existence

of a fact and one where the fact is rightly apprehended, but the reasoning upon the fact and the conclusions drawn from the existing fact are entirely wild and absurd, showing that the insanity is in the mental powers and operations.

Coming to the case before them, the judge asked "if a delusion existed in any form, was it an insane delusion?" He then gave to the jury a definition furnished by the counsel for the appellant, as follows: "In a legal point of view, insanity is where a person believes something to exist, which not only does not exist, but of which he has no evidence sufficient to satisfy any healthy mind, and he acts upon it, reasons upon it, and holds it as a reality." This was given as an instruction, the judge adding this: "That may be an insane delusion; that is to say, where it is so palpable that he believes it without reason; any reason sufficient to satisfy any healthy mind; and he acts upon it, when it cannot possibly be true; that is an insane delusion."

Now this additional explanation is strongly objected to by counsel as extending the rule given in the book to the injury of his client. But the rule starts with the absolute assertion, or assumption, as the basis of the whole rule of law, of the fact that the "something which the person believes to exist" does not exist. It requires, to start with, the absolute non-existence of the fact believed to exist, and this, of course, must be established conclusively, before any conclusion of insanity can be drawn. It would seem to be too plain to need any argument, that before an insane delusion as to a fact, could be predicated or established, the non-existence of the fact must be, in some mode, put beyond doubt. The judge in another part of his charge said: "Before any thing (in law) is a delusion, the non-existence of it must first be established."

The qualification, as given, was rather to relax the rule in favor of the positions of the appellant than to make it more stringent. It evidently had particular reference to the belief in spiritual and supernatural influences and communications. By the literal meaning of the rule given in the book, it must first be established absolutely, as a demonstrated fact, that the matter or fact, about which

Robinson *v.* Adams.

the delusion was said to exist, had no existence. But, clearly, it would be impossible to prove that, in the present instance, by direct testimony. The judge, therefore, qualified the rule, by allowing the jury to find that it might be an insane delusion, if the testatrix believed what could not possibly be true, although no positive or direct evidence was or could be offered, to establish the falsehood of such spiritual beliefs. The jury might determine this point in favor of the proposition of insanity, on their own conviction of the impossibility of the truth of the facts on which the claimed delusion rested. We do not see how the appellant was injured by this qualification of his requested instruction by the presiding judge.

The jury were then directed to apply this test to all the facts in the case, as shown in the evidence. The principal difference between the requested instructions and those given, is in this : the requests asked for rulings that should declare, as matter of law, that certain facts and matters recited, were each in themselves, insane delusions, and rendered the will, for that cause, void ; the rulings given did not so declare, but required the jury to determine, after a full and fair consideration of all the evidence bearing on the question, whether the testatrix was under an insane delusion, within the rule given.

The court will not ordinarily withdraw the questions raised under the issues framed from the jury, where the very purpose of framing such issues, is to have the jury inform the court as to the truth of certain allegations, as is the case where the Supreme Court of Probate is called upon to probate a will, and the due execution of it; or the soundness of mind of the testator is in question. It is the duty of the court to give instructions on the points of law, and to explain and illustrate them, but it will not, unless possibly in some cases where there can be no real question of fact to be determined, undertake to direct the jury what their finding shall be. Even then it would be the more proper course to withdraw the issues from the jury, and for the court to act on its own convictions, without the aid of a jury. There is no com-

mon law right to demand a trial by jury in cases of appeal from
the probate court.   It is only when, upon a hearing of such appeal
"any question of fact occurs proper for a trial by jury, an issue
may be formed for that purpose, under the direction of the court,
and so tried."   It is true that if the requested instructions had
been given, some questions of fact would have remained for the
jury; but, substantially, the court would have declared that she
was not of sound mind.

The grounds chiefly relied upon to show unsoundness of mind
were the belief in spiritual communications, particularly with the
spirit of her deceased husband, and her suspicions and beliefs as to
her son-in-law, Mr. Robinson, touching his exposure to the control
of evil spirits, and his possession of supernatural power over his
wife, through the aid of evil spirits.

The judge did not rule that the belief in what are called spirit-
ual communications or revelations, that is, that spirits do commu-
nicate with human beings through mediums, was *ipso facto*, and
in itself, an insane delusion.   Nor did he say peremptorily that it
was not; but he told the jury to consider how far that belief
showed delusion, under the rule before given them, and whether
that belief was in itself an insane delusion.

The learned counsel for the appellant, has denounced such belief
in very powerful and eloquent language, and calls upon the court
to deny to it "a standing in court," and to show its concurrence in
the denunciation of an English judge, who termed it "mischievous
nonsense," with other like designations.

And yet the good sense of the counsel realized that we were
called to deal with this matter not theologically—or in one sense,
morally or scientifically—but legally, as bearing on the single
point of insanity, or insane delusion.   What our individual or
collective opinion as to the facts, truth, possibilities, or evidence,
or claims, of this so-called spiritualism, may be, has nothing to do
with the questions before us.   It is only as to the proved effect of
this belief on another person's mind, that is before us.   Did this
belief unsettle her intellect, and make her of unsound mind,

within the meaning of the statute? Even if true, it might produce that effect, by a long continued, and exclusive and fanatical devotion to the thought. The judge so said in substance when he stated to the jury, by way of illustration: "Now there are questions constantly arising in relation to mere speculative belief in abstract propositions of theology or law, or other matters, particularly in theology, spiritual truths. These mere speculative beliefs of abstract propositions you may think very absurd; you do not see how anybody could believe such things, such creeds or doctrines, yet others may believe them, and not be insane. They may rest so in a person's mind, and work so in his intellect, may upset his mental powers generally, or partially, or topically, on particular points, so that he may become insane, arising from this very cause."

He illustrated further, by the case of a man, who believed fully in the second coming of Christ, personally and bodily. This to many may seem a strange and unsustained faith. But would any one say it was an insane delusion? But by constantly dwelling on this single idea, he comes to believe and to proclaim his belief, not merely that Christ will come again on earth, but that he himself is the very Christ that was to come, and to assert his official character with perfect assurance and sincerity. There the delusion would be, not in the original faith, but in the consequences that have worked out from it in his mind, finally upsetting his powers of reasoning, until we say that man has an insane delusion.

The judge also stated further that in this case it was contended that the testatrix believed more than this simple proposition of the existence of spiritual communications; that she believed that she had the power to heal, and to some extent exercised it at home and on others; that she believed it was the same sort of power that was employed by Christ and the apostles; and, further, that she had various other imaginations and delusions, in one form or another. The judge then gave the rule before stated, telling the jury that all these matters were before them, and it was for them to say, in view of them all, whether singly or together they had brought her to the state of unsoundness of mind, by reason of insane delu-

sion or illusions; and whether such delusions operated upon her in making this will.

Preliminary to this summing up and as included within it, attention had been called also to all the evidence touching the relations between the testatrix and her daughter and Mr. Robinson, and her beliefs and acts, and feelings and declarations, with the distinct instruction that "if the conditions in the will were made through dislike of Mr. Robinson, if that state of mind was a delusion and had reached the point of being an insane delusion, and it was for them to determine whether it did or not, then it would invalidate the will."

We do not perceive what valid objection can be made to the charge on this point of soundness, when it is examined in its full scope and fair meaning. Indeed, the counsel frankly admits in his very elaborate argument on all the points; "we do not contend that a mere speculative belief in spiritualism, if it is not acted upon, and has no influence over the testator, would render a person incompetent to make a will."

This belief, then, *per se,* is confessedly not insanity or an insane delusion. But the counsel does contend that "if the will was made under such an influence, or if such an influence had any effect upon the mind of the testator in making the will, it is invalid."

But if the belief was not in itself an insane delusion, how could acting upon it sustain the plea of unsoundness of mind? Or why should the judge rule, as matter of law, that acting upon a belief, confessedly not in itself incapacitating, invalidates the will?

But it was contended that the proposition was correct as applied to the issue, charging undue influence. This leads us to the consideration of the rulings on this separate and distinct point. The instructions on this head started with the assumption that the jury failed to find such insane delusion as would invalidate the will. The court said: "It is contended that if there was sanity, and no general or specific delusion to a degree sufficient to invalidate the will, yet that such a dominion or influence was obtained by others over the testatrix as to prevent the exercise of her own

Robinson *v.* Adams.

judgment, will and wishes, and that the will was in fact not the expression of her own will and wishes and intentions, but was substantially the act of others, and not of herself." The judge in substance, said that such influence, however exerted, would be undue, and would render the will made under it, void; that it must be such and so exercised, as in effect to destroy the freedom of the testatrix's will, so as to render her act more the offspring of the will of others than her own, at least in some of the provisions of the will.

He said, "that a testator might receive the advice, opinions and arguments of others, and if after all such advice, requests or persuasions, however persistently, or however strongly urged, the testator is not controlled by them to the extent of surrendering his free agency, and yielding his own judgment or will, and so, not making his own will, but adopting for his own will, the will or wishes of others; then there is no such undue influence as is required to be proved to avoid the will."

There seems to be no exception to these rulings so far as they apply to living persons. The rule as given is according to the most approved authorities. But there remained the point, as to undue influence, connected with the alleged spiritual communications. On this, the judge said: "The question arises, if she was of sound mind generally, and if no living person did unduly influence her, yet she may have been under the control and dictation of what she believed was the spirit of her deceased husband, communicating to her directly through a medium: and that to her it was a reality; and that her own will was subordinated to her husband's will, and that will was his and not hers. It is contended that this was a delusion, and an undue and improper influence. On this point I give you the same rule as before stated. If she did thus believe, and if she did have what she deemed direct communications on the subject of this will, and implicitly followed them, yielding her own will and judgment and exercising no free agency (as before explained) then it would not be her will, but another's, in the same manner as if actually dictated by a living person.

But if she did thus believe, and had what she deemed her husband's opinions, wishes or judgment, if she nevertheless acted her own will and her own judgment, as before explained, and did not abandon both to the supposed wishes and opinions of her husband, then it would not be undue influence, although she might have had full faith in the supposed communications and have regarded them as her husband's advice. I give you the same rule, in short, as I gave as to living persons."

We have made these full extracts, in order to present distinctly the exact point decided.

It will be observed that the ruling on this point was entirely disconnected from that relating to insanity or insane delusion. It proceeds on the ground that the testatrix was of sound mind, and that this matter of a belief in spiritual manifestations was not found by the jury to be an insane delusion.

The appellant contends that if any such communication had any influence, however slight, or however short of dictation, on the mind of the testatrix, it would invalidate the will, although in all respects she was of sound mind.

There is no doubt that the law allows any person to seek advice, suggestions and opinions from others, where no fraud or deception is practiced. The law does not limit the range. If a pious man of sound mind should seek advice by prayer, and should believe that he had a direct answer and should regard it, not as dictation but advice entitled to consideration, would any one say that his will could be set aside as made under undue influence? Or if such a man should say, "I have had a dream which impresses me considerably as to the disposition of my property, and I shall give it consideration," would any one say his will was void, unless it was shown that the testator yielded his own will and judgment to the suggestions of his dream? In this case, the widow, it is assumed, thought she had received letters, not from an absent husband, but from one who had gone beyond this world to another, and in them some suggestions as to the disposition of her property; that she did not yield implicitly and blindly to these suggestions,

but regarded them,—as she would have regarded such letters if they had been written during life—as friendly suggestions, which had some effect on her mind, but not to the point of destroying her own free will and deliberate judgment. Now, it is evident that the judge must either direct the jury to disregard entirely all this matter about spiritual communications, as having no bearing on the question of undue influence, or rule that if they had the slightest influence on the mind of the testatrix in making her will, they entirely invalidated it; or else rule, as he did, that they must be taken into consideration by the jury and come under the general rule as to undue influence, and be subjected to the same test. If they dictated the will, it was void. If they influenced the mind, but did not control it in making the will or any part of it, then the will would not be by them invalidated on the ground of undue influence.

Without pursuing this point at more length, we say that we do not find these instructions erroneous.

There were several objections made and exceptions taken in relation generally to the admission or rejection of evidence. The first is, that the subscribing witnesses to the will were allowed to testify to their belief and opinion as to the soundness of her mind at the time of executing the will. It is not denied, however, that such witnesses may so testify.

But it is insisted that, to lay a foundation for such admission, all the facts transpiring at the time, all that was said and done, and all the premises from which the conclusion was drawn, must be stated. We do not so understand the rule or the practice. The rule admitting the opinion of witnesses to a will is somewhat exceptional. It is thus stated in Greenleaf on Evidence: "Witnesses to a will are permitted to testify as to the opinions which they formed of testator's capacity, at the time of executing his will." It is the opinion then formed that is admissible. The precise point in the examination when the question is put is not material. It may be as soon as they have shown that they were present and witnessed the will at the request of the testator. It

is the fact of being a witness to the will, that gives this right to ask his opinion of the soundness of mind of the testator. It may be given, although the witness was suddenly called in, and heard only the request to sign and the declaration of its being his last will. It is undoubtedly true that all the facts seen or known by the witness at the time are proper subjects of inquiry by either party, and it is proper that they should be. But it is not legally necessary that all should be detailed by the witness, if not asked by either party, before he can give his opinion. The weight and value of his opinion may depend very much upon his means of observation and knowledge; and if he can give few grounds for his belief or opinion his testimony would, doubtless, have very little weight with the jury. But it is for the parties to bring out from the witness such facts as they deem important, touching the extent of knowledge on which the witness bases his opinion.

The exceptions to the answers of Narcissa Stone and Wm. G. Barrows are based on the assumption that they were expressions of opinions by non-experts. These answers were given in connection with details of certain facts introduced by the appellees, in refutation of the allegation of unsoundness of mind made by the appellant.

They were both mere negations; statements that they did not observe certain facts touching the mental condition of the testatrix; i. e., one said she did not observe any failure of mind, and the other, who was a witness to a former will, that he observed nothing peculiar. *State v. Pike*, 49 N. H., 408.

The only objection in the argument is, that these were expressions of opinion on the question of testamentary capacity.

The question, whether opinions of witnesses not experts are, in all cases where insanity or delusions are in question, to be excluded, has recently been much discussed, particularly in a learned opinion by Mr. Justice Doe of the supreme court of New Hampshire.

If the case required it, we might, perhaps, review some of the former decisions of this court. But, certainly nothing less than a

distinct expression of the opinion of the witness, given as such opinion directly, comes within our rule. Mere negations, such as stated by these witnesses, do not give to the jury an affirmative opinion. They, at most, state negatively that nothing was observed by them. This is not an opinion of the witness, but had relation to a fact, as to the condition of the person.

The next exception is that a witness was not allowed to testify to the contents of a letter. A witness (the appellant) having testified that her mother, (the testatrix) when visiting her at the west, had received letters, a good many from Maine, which made her uneasy and discontented, she was asked from whom they came. This was objected to; the appellant, by her counsel, then offered to show that they were received from A. J. Stone and Mrs. Dennett, but it was objected to, and the question ruled out. A similar ruling was made, when, after Mr. Robinson had testified that some communications were sent to Bloomington that were injurious to him and his family, on objection, the court ruled that the witness could not state the contents of the communications.

No evidence was offered of the loss of the letters or of any attempt to obtain them, by summons or otherwise. The rejection of this evidence was clearly within the well-established rule, that the contents of a written document cannot be given by a witness, except in case of loss or inability to obtain it.

Another objection has relation to the admission of the declarations of the testatrix, written and verbal, to show the state of her mind. The report states "that the defendant (the appellant) seasonably made a general objection to all declarations, conversations, statements and acts of Mrs. Green, which did not relate to the subject of spiritualism, or the execution of the will or codicil sought to be set up. The testimony was not thus limited by the court, by a specific ruling to that effect as requested, but testimony was given, as appears in the report," not limited as requested.

Was it the duty of the judge thus to limit in advance, or at all?

The issue was a general one; soundness of mind. The executors had offered some testimony upon this point; the appellant then

offered a great mass of evidence, tending to show a want of soundness. This evidence was not confined to spiritualism, or the execution of the will; it embraced evidence tending to show that Mrs. Green not merely believed in spiritual communications, but that she entertained delusions of an extraordinary nature concerning her son-in-law and his wife; particularly concerning Mr. Robinson. As before stated, there was a great deal of evidence on this matter, covering many years and many declarations, acts, imaginations, and asserted delusions. And there was further evidence, on a matter not properly a part of a belief in spiritualism, as generally understood. It is thus stated by the judge in the charge: "But it is contended that she believed more than that simple proposition; that she believed that she had power to heal, and to some extent, exercised it at home and on others; that she believed it was the same sort of power that was employed by Christ and his apostles; I suppose of the same nature as the power possessed in those miraculous days; and that she had various other imaginations, delusions in one way and another." The appellant offered evidence on all these matters, which was admitted, including spiritual communications and declarations of various kinds; all admitted to show the state of the testatrix's mind, covering many years.

The executors resumed, and the judge permitted them to show like declarations, acts, beliefs, &c. There was no limitation suggested until after the appellant had put in this great mass of evidence. The issue was on the soundness of mind of the testatrix, and the court ruled that the burden to sustain this general proposition was on the executors, and that it did not shift, but remained on them to the end. Spiritualism and the due execution were not the only matters to be considered, or rebutted. The great fundamental rule of law, which requires impartiality between the parties, would have been violated by the ruling requested, and it was properly refused. How far a party can be allowed to interpose objections as to particular testimony under such a general objection, may be very questionable. But if open, we do not find, on perusal of the report, any admission which is clearly illegal. The rule allowing the introduction

Robinson *v.* Adams.

of the declarations of a testator, to show the condition of his mind, is very general, and admits much that would be excluded if offered as testimony to prove facts. The rule allows great liberality to both parties as to the kind of evidence, and as to the length of time over which it extends. Much is necessarily left to the discretion of the presiding judge, and it is impossible to lay down any general rules which would cover all cases. To enable the jury to determine the real state of mind, the action of that mind, as shown best by conversations, declarations, claims and acts, is the most satisfactory evidence. But, in order to fairly judge, the examination must not be confined to a single declaration, or conversation, but must embrace sometimes many years and many different acts and declarations, and sometimes, perhaps, the evidence may, at first view, be remote and far from a demonstration.

The judge was very decided and emphatic in his charge to the jury in enforcing upon them the fact, that these declarations of Mrs. Green were admitted to show her state of mind, and of her feelings toward the parties, and whether or not they exhibited evidence of insanity, or delusion amounting to insanity, at any time. "They are not to be regarded as proof that what she said to the witnesses, or wrote in these papers, were facts. They are not given on oath. They are not legal evidence of the facts stated." The judge repeated and elaborated this idea, so that the jury must have understood the weight they could give to this species of evidence.

The exceptions, however, as to this part of the case, are that the evidence was not confined to spiritualism and the execution of the will. We think it clear that it should not have been.

The chief, if not the only, specification dwelt upon by the counsel, is the written statement of Mrs. Green, which has annexed to it a jurat. The counsel is mistaken in saying that it was used as evidence of the facts therein stated. It was admitted expressly—the same as much other evidence of a like character—solely to show the state of mind of the testatrix in reference to the very matters in question. The jurat did not make it a deposition, or

give it any greater force or effect.   It was still the declaration of Mrs. Green, and the jury were charged distinctly, not to regard it as proof of the actual existence of any fact.

The rule given as to the burden of proof was clearly correct.

*Exceptions and motion overruled.*

APPLETON, C. J., WALTON and DICKERSON, JJ., concurred.

BARROWS, J., did not sit in this case.

---

NOTE:—At the December term, 1874, for Sagadahoc county, the proponents having withdrawn from the prosecution of the will, it was disallowed and refused probate, by arrangement, and upon payment of $3000 to the contingent legatees by Mrs. Robinson, the sole heir-at-law; the whole estate being valued, at that time, at about twenty-seven thousand dollars.